No. 85,735

STATE OF KANSAS, *Appellee*, v. FLOYD SCOTT BLEDSOE,
*Appellant*.
(39 P.3d 38)

Opinion filed February 1, 2002.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*Jim A. Vanderbilt*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

SIX, J.: This is primarily a sufficiency of the evidence case. Defendant Floyd S. Bledsoe appeals his convictions for first-degree premeditated murder, aggravated kidnapping, and aggravated indecent liberties. K.S.A. 21-3401(a); K.S.A. 21-3421; K.S.A. 21-3504. Our jurisdiction is under K.S.A. 22-3601(b)(1) (an appeal of a conviction for an off-grid crime receives review by this court).

Bledsoe claims multiple violations of his due process guarantees of the 5th and 14th Amendments to the United States Constitution. He asserts: (1) The evidence was insufficient to support his convictions and (2) the district court erred by (a) admitting hearsay evidence and (b) allowing an officer to testify regarding certain police interview statements made by the defendant's brother.

Bledsoe's due process arguments appear for the first time on appeal. The challenges to his convictions below, expressed in his motion for a new trial, were framed as claims of insufficient evidence.

Finding no error, we affirm.

## FACTS

On Monday, November 8, 1999, the body of Bledsoe's 14-year-old sister-in-law C.A. was found buried in the trash dump on the property of Bledsoe's parents. At the time of her disappearance, C.A. was living with Bledsoe and his wife Heidi. (Both locations were near each other outside of the town of Oskaloosa.) On November 5, 1999, C.A. rode the bus home from school. She was dropped off at the Bledsoes' trailer home around 4:20 p.m. A friend of C.A.'s stopped by around 5 p.m., but C.A. was not there. The friend entered the trailer. She noticed that C.A.'s coat and school bag were in the living room.

Tom Bledsoe, the defendant's brother, was originally arrested for the murder. Tom lived with his parents. Two days after C.A. was reported missing, Tom turned himself in and, through his attorney, led investigators to C.A.'s body. Her body was found under a pile of dirt, with several sheets of plywood and some clothing on top. She had been shot once in the back of the head and three times in the chest. According to forensic evidence admitted at trial, the shot fired to the back of C.A.'s head was a contact shot and was not fired at the location where she was found.

The murder weapon, a 9 mm semiautomatic pistol found in Tom's bedroom, belonged to Tom. He had purchased the gun about 2 weeks before the murder. Tom kept the gun behind the seat in his truck. No fingerprints were found on the gun. After inspecting the gun and shell casings from the crime scene, the

Kansas Bureau of Investigation (KBI) concluded that the bullets from those casings had been fired by Tom's gun. The KBI lab could not be certain that the bullet lodged in C.A.'s head was fired from Tom's gun. Shells matching those fired from Tom's gun were found in his bedroom.

William Knoebel, a colonel in the United States Army and a professor of military science stationed at Ft. Leavenworth, was bow hunting deer on Friday, November 5, 1999, the evening of C.A.'s disappearance. The area where he was hunting was near the Zule dairy farm, where Bledsoe worked. The colonel used a large map of the area to explain and mark his location for the jury. (The large diagram map was an admitted exhibit. It showed the location and proximity relationship of McLouth, Oskaloosa, the Zule dairy, the home of Bledsoe's parents, and Bledsoe's trailer.) Around 5:30 p.m., Knoebel heard a woman scream and the words, "[P]lease don't hurt me." A few minutes later, he heard another scream and the words, "[P]lease don't hurt me, somebody help, please don't hurt me." He described what he heard:

"At first I thought that this was a, it could have possibly have been somebody who was, you know, outside playing or something like that but there was that peculiar sound when you hear a, a girl or woman scream that just was not of the ordinary of a normal little fight or a tiff between individuals. This was, there was something distinct about that, and I waited a few minutes and as I was sitting in the deer stand and I thought, you know, that, that was awfully peculiar, and the inversion factor in that valley at that time and the atmospheric conditions in that, that little creek bed there were pristine so the next time I heard the scream, which was a minute or two later, it was very clear to me that there, there was somebody that was clearly in distress. The words came out again, '[P]lease don't hurt me, somebody help, please don't hurt me,' and continued like that. At that time it was very clear in my mind that somebody was . . . in need of some help, so I got out of my deer stand, very quickly got out of my deer stand and I went directly to the north, northwest, to where I believed that the, the screams were coming from, because they were clearly to my back. . . . I started running toward where I thought I heard the sound coming from."

After the second scream, Knoebel heard nothing else. Knoebel also testified that he did not hear any shots. Richard Zule, the owner of the dairy farm, testified that he was working outside at that time, but he did not hear any screaming.

On Saturday, November 6, 1999, Dan Courtney, a neighbor of the Bledsoe family, saw a truck around 8 or 9 a.m, resembling Tom's, coming out of the field where C.A. was buried. Tom made a statement to police implicating Bledsoe. Tom testified that on November 5, around 3 p.m., he picked up his paycheck at Farmland Industries in Lawrence, where he worked as a security guard. Then, he went to a bait and tackle store to look at a rifle and bows. Tom said that around 4 p.m. he went to Rusty's Outdoor Equipment to buy ammunition. The store manager testified that the receipt issued to Tom was generated at 4:30 p.m. When Tom left Rusty's, he used his cell phone to call his father before he drove home, but his father was not home.

Tom attended a church function at 6 p.m. When he returned home around 9:30 p.m., his parents were not there. He went to bed. His parents arrived about 30 minutes later. The next morning, Tom helped around the house and worked on a lawnmower. Bledsoe called his father earlier that morning and told him that C.A. was missing. The police had also called and asked Tom if a 13-or 14-year-old girl had been seen around there. Tom told them she had not.

On Saturday, November 6, 1999, Tom left for work between 11 a.m. and 1 p.m. He testified that on his way to work, he saw Bledsoe's green car with a white top. Tom stopped Bledsoe at the edge of Oskaloosa. He asked him if C.A. had been found and if any fliers had been handed out. Tom also mentioned that the police were looking for C.A. Bledsoe knew the police were looking for her.

Tom testified that Bledsoe laid his head on the steering wheel and looked a little nervous. When Tom asked him what was wrong, Bledsoe said C.A. was dead. Tom said Bledsoe was mumbling, but he heard him say "accidentally shot her." Tom asked, "What?" Bledsoe said, "She's dead, accidentally shot her." Tom testified that he asked Bledsoe why she was dead. Bledsoe shook his head and shrugged his shoulders.

Then, Tom said he started asking why she was dead and if Bledsoe had raped her or sexually abused her. Bledsoe responded, "Yes, no, I don't know." Bledsoe told Tom that he recalled her shirt and bra were above her breasts and that he used Tom's pistol to shoot

C.A. Tom said he reached behind the truck seat and felt his gun in the case. He said Bledsoe knew he kept a gun in his truck. Tom testified that Bledsoe told him he shot C.A. once in the back of the head and twice in the chest. When Tom asked where C.A. was, Bledsoe told him she was in the trash dump behind their parents' house underneath plywood, trash, and dirt.

Tom said Bledsoe told him not to tell anyone. If anyone were to come snooping around, he wanted Tom to take the blame. If Tom did not take the blame, Bledsoe would tell people about Tom's past. At trial, Tom acknowledged that Bledsoe had threatened him this way before to get what he wanted. Tom thought Bledsoe would reveal that he had tried to have sex with a dog, had been caught with dirty magazines, and had played with himself while watching dirty movies.

When Tom got to work, he examined his gun to see if it had been fired. He had cleaned the gun the previous week, and, as far as he knew, it had not been fired after the cleaning. When he smelled the gun, it had a "burnt smoky smell." Tom had loaded the gun with 10 shells before putting it behind the truck seat, but now there were only 2 shells left in the gun. Tom thought about whether he should go to the police with the information or keep his mouth shut and "take the rap."

When he got off work at 11 p.m., Tom went home to "make sure if what [Bledsoe] told [him] was true." He drove out to the trash dump and looked around with a flashlight. He noticed shovel marks in the side of the bank of the ditch and that some plywood was out of place. Tom got down into the ditch and looked under the plywood. Trash was blocking his view. (He did not see C.A.'s body.) Then, he got out of the ditch and looked for the shovel that he had used earlier in the week to dig up a tree. After spotting the shovel, Tom returned to his truck and drove home. He put his gun in his dresser drawer.

After church the next evening, Tom went to the police station. He testified that he "was taking the blame." Before talking to police, he called Jim Bolinger, his minister, and left two messages. In the messages, Tom said he was sorry and that he would "pay for the rest of [his] life for what [he had] done." He did not say that

he killed C.A. However, Tom told officers that he had shot C.A. He testified that he turned himself in for something he did not do because he did not want people to know about his past. He said he also thought about wanting Bledsoe's children to grow up with a father in the home. A day or two after his arrest, Tom was "ashamed" about lying and talked with police again, implicating Bledsoe. He testified that he could not live with himself because Bledsoe had told him where C.A.'s body was.

Bledsoe's 2-year-old son Cody, who did not testify at trial, allegedly made statements implicating either Tom or Bledsoe in the crime. The child's statements developed in the following manner. Bledsoe and his wife Heidi had two sons. Heidi dropped the boys off at a babysitter's house around 12:45 p.m. on Friday, November 5, 1999, before she went to work. The babysitter watched the boys until 12:45 a.m., when Bledsoe picked them up. Bledsoe brought them back to the babysitter around 2:45 a.m., and he returned at 8:30 a.m. On Monday night (November 8, 1999), Cody told Heidi that Tom had killed C.A. He described Tom shooting C.A., wrapping her in a blanket, and putting her in the dump. Rosa Bolinger, who attended the same church as C.A., said she also heard Cody telling a story about Tom shooting C.A. Rosa told police that Cody said, "Tom shot [C.A.], boom, boom, boom, boom, and dumped her in the water. Tom put his, Cody's, blanket around [C.A.] and also put [C.A.'s] blanket around her. . . . Tom closed [C.A.'s] eyes and he kissed her cheeks." Later, Cody changed what he said, telling his mother "Daddy" shot her.

Bledsoe spoke to law enforcement officers on Monday, November 8, 1999. He said that he met C.A.'s school bus on the road on the previous Friday after it stopped at his trailer. Bledsoe said he stopped at his trailer, but C.A. was not there. He then denied going to the trailer. Detective Frost went to a hardware store and verified that Bledsoe had purchased duct tape and a sweatshirt at 4:20 p.m. on November 5, 1999. After returning to the Zule Dairy Farm where he worked, Bledsoe went out into a field to check on a cow and then rode a four-wheeler toward the farm to start milking the cows. Richard Zule estimated that the milking takes 3 ½ to 4 ¼ hours, followed by about 30 minutes of barn cleaning. Bledsoe

called Zule at 11:30 p.m. to tell him that one of the cows was not giving milk.

Heidi arrived home from work around midnight on November 5, 1999. Bledsoe pulled his car in behind her. They separated to look for C.A. Heidi reported C.A. was missing. Bledsoe picked up two of C.A.'s sisters and returned with them to Oskaloosa. The next day, Bledsoe took fliers describing C.A. to the school. He wore the black sweatshirt he bought at the hardware store from Friday night until Sunday.

Investigators did not establish the location where they believed C.A. was killed.

## DISCUSSION
### First-Degree Premeditated Murder

Bledsoe contends that his conviction for first-degree premeditated murder was not supported by sufficient evidence. We disagree.

A prologue to any sufficiency of the evidence analysis is the recognition of our standard of review. The standard is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Evans*, 270 Kan. 585, 590, 17 P.3d 340 (2001). A guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial. *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

Bledsoe argues that neither direct nor circumstantial evidence supported his conviction. He contends that the State relied entirely upon his alleged roadside confession to his brother Tom. He asserts that the roadside confession is highly suspect and that the confession was uncorroborated by any evidence, other than the discovery of C.A.'s body. Bledsoe notes that Tom testified that the day after C.A.'s disappearance, Tom left for work between 11 a.m. and 1 p.m. Tom said that as he was leaving, he met Bledsoe on the road, waived him over, and asked if C.A. had been found.

In his first statement to police, Tom claimed that the conversation with Bledsoe took place before noon. Officer Carreno testified that he was at Bledsoe's trailer from about 9 a.m. on November 6, 1999, until about 12:17 p.m. and that Bledsoe was there the whole time. A neighbor testified that he was driving by the trailer between 12:15 p.m. and 12:30 p.m. that day, and Bledsoe stopped him and handed him a flier. Officer Carreno said he provided Tom with information to help him. He said Tom was not sure about the time that he talked to Bledsoe on the road and had not been trying to be exact when giving a time. When Tom reviewed and remembered the different events, he changed the time of his talking to Bledsoe on the road to after noon.

Bledsoe argues that there was no explanation offered about how he stole Tom's gun, killed C.A., buried her on the family farm, and replaced the gun without anyone noticing. He notes that there was a dog on the property and the family was home late that night but did not hear any shots.

The State counters that there was evidence that C.A. was afraid to be alone at night with Bledsoe when Heidi was working. Rosa Bolinger testified that C.A. told her that Bledsoe was always "hitting on her" and trying to get her to wrestle with him. If he would not stop, she would go to her room. The State also contends that Bledsoe was in love with C.A. The record shows that Bledsoe told police that he loved C.A. Bledsoe and Heidi were getting a divorce, and he had asked C.A. what she was going to do after the divorce. She apparently told Bledsoe that she did not know, but C.A. told Rosa that she wanted to move in with her.

Around 10:30 p.m. on Friday November 5, 1999, C.A.'s mother phoned Bledsoe and said she was going to call the police. Bledsoe told her not to. Bledsoe's brother-in-law testified that he and two other people drove to the dairy at around 11 p.m. to talk to Bledsoe, but Bledsoe's car was gone and the lights were out. At 12:45 a.m., Bledsoe picked up his sons from the babysitter and returned them to the babysitter about 2 hours later. Cody, the 2-year old son, told people that Tom shot C.A., that she was wrapped in a blanket, and that she was put into the dump. Later, he said his "Daddy" shot

her. Heidi acknowledged that Cody's story and his actions were graphic enough to suggest that he observed what he was describing.

Bledsoe's father testified that he saw Bledsoe's green car pass on the road the next day, sometime after Tom left. In a conversation between Bledsoe and his mother, his mother stated, "Well, I know Tom didn't do it." Bledsoe responded, "Yes, I know Tom didn't do it, somebody else did it." He followed with, "Well, maybe Dad did it, then." His mother countered, "Floyd, that's not true." While in jail Bledsoe said he did not do it.

Bledsoe argues that the State had only the testimony of his brother Tom to take the case "beyond mere speculation that [Bledsoe] was involved." He aptly notes that a murder conviction must be grounded on something more than probabilities, possibilities, or suspicions of guilt. See *State v. Doyle*, 201 Kan. 469, Syl. ¶ 9, 441 P.2d 846 (1968). He cites *State v. Naramore*, 25 Kan. App. 2d 302, 322, 965 P.2d 211, *rev. denied* 266 Kan. 1114 (1998), where the Court of Appeals reversed the jury verdict after finding it inconsistent with the "extremely strong" evidence in Dr. Naramore's favor. Dr. Naramore was found guilty of the attempted murder of one patient and the intentional and malicious second-degree murder of another patient. The Court of Appeals concluded that there was "nothing close to a medical consensus that Dr. Naramore's actions were homicidal." 25 Kan. App. 2d at 321. The *Naramore* result does not persuade us here. The evidence here did corroborate Tom's version of events.

C.A. was afraid to be alone at night with Bledsoe. Bledsoe loved C.A. and wanted to know where she would live after he and Heidi were divorced. C.A. was dropped off at the Bledsoe trailer by the school bus driver at 4:20 p.m. on Friday, November 5, 1999. Bledsoe admitted to two different law enforcement officers on two separate occasions that he had been at the trailer within minutes of her being dropped off. A friend found C.A.'s school bag at the trailer at 5 p.m., but C.A. was not there. Colonel Knoebel heard screams of a young woman near the dairy where Bledsoe worked. Bledsoe could have been finished with his chores around 10:30 p.m. when he received a phone call from C.A.'s mother indicating she was going to call the police. He told her not to do so. He was

absent from the dairy shortly thereafter. At 12:45 a.m., he picked up his son Cody from the babysitter and returned him to the babysitter 2 hours later at 2:45 a.m. The evidence suggests that Cody witnessed C.A. being shot and put in the ditch. Cody was only with Bledsoe when he was not at the babysitter's home. Bledsoe knew Tom kept a pistol in his truck. He admitted to Tom that he killed C.A. with Tom's gun. He admitted when Tom asked him if he raped C.A. that he knew her bra was over her breasts. He told Tom where the body was buried. Bledsoe's father confirmed that Bledsoe was in his green car in the area after the roadside conversation between Bledsoe and Tom. Bledsoe informed his mother that he knew Tom did not kill C.A. and then attempted to blame his father.

In addition, it is noteworthy that the district court gave a cautionary jury instruction regarding the testimony of an informant.

The jury heard Tom's testimony. Floyd did not testify. The case was tried and argued to the jury primarily as a contest of Tom's credibility. The jury believed Tom. This it was entitled to do. Bledsoe essentially asks us to reweigh the evidence. Our function is not to reweigh the evidence or pass on the credibility of witnesses. *State v. Saiz*, 269 Kan. 657, 664, 7 P.3d 1214 (2000).

### Bledsoe's Conviction for Aggravated Kidnapping

Bledsoe also contends that even if there was sufficient evidence to support his murder conviction, his conviction for aggravated kidnapping was not supported by sufficient evidence. This contention lacks merit.

The district court gave the following aggravated kidnapping instruction:

"To establish this charge, each of the following claims must be proved:
No. 1. That the defendant, Floyd Bledsoe, took or confined [C.A.] by force or threat;
No. 2. That it was done with the intent to hold such person;
    a. To inflict bodily injury or to terrorize the victim;
No. 3. That bodily harm was inflicted upon [C.A.]; and
No. 4. That this act occurred on or about the 5th day of November, 1999, in Jefferson County, Kansas."

Bledsoe notes that at the close of the State's case, the district judge commented that he had heard no evidence of kidnapping.

However, the judge later denied Bledsoe's motion for judgment of acquittal, observing there was substantial evidence to support the jury's verdict.

According to the coroner, it was likely that C.A. was shot in the head first, placed in the position in the ditch, and then shot three more times. Bledsoe argues that none of the State's evidence supports a theory that she was confined, taken by force, or moved until after her death. He asserts that there was no evidence regarding the locale where C.A. was shot in the head. The investigators concluded that based on the lack of physical evidence at the burial site, such as blood, she was not shot in the head at the site. Bledsoe argues that if the shot to the back of C.A.'s head was fired first, it may have been fired suddenly, when C.A. was in a place to which she had voluntarily accompanied her abductor. The State contends that circumstantial evidence proves that C.A. was taken or confined by force or threat at the dairy with the intent to hold her to inflict bodily injury upon her or to terrorize her.

Both parties cite *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). In *Buggs*, we found that to constitute kidnapping, where a taking or confining is allegedly done to facilitate the commission of another crime, the resulting movement or confinement must not be slight, inconsequential, and merely incidental to the other crime. The confinement must not be of the kind inherent in the nature of the other crime and must have some significance independent of the other crime, in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection. 219 Kan. at 215-16.

Bledsoe argues that here there was no evidence of any kind concerning the movement of C.A., except that she was not at the trailer shortly after the bus dropped her off. He points out that if C.A. went willingly with the killer to another location, there was no taking or confining by force or threat. There was no evidence that C.A. left the trailer unwillingly.

The State relies on *State v. Montes*, 28 Kan. App. 2d 768, 21 P.3d 592, *rev. denied* 271 Kan. 1040 (2001), for the assertion that after an attacker has moved a victim with the victim's consent, then moves the victim a second time while she actively resists the attack,

and subsequently rapes the victim, the aggravating kidnapping conviction should be affirmed. See 28 Kan. App. 2d at 772.

Bledsoe directs our attention to cases where we have concluded that the use of force or confinement was merely incidental to the underlying crime. See *State v. Hays*, 256 Kan. 48, 63, 883 P.2d 1093 (1994); *State v. Ransom*, 239 Kan. 594, 603, 722 P.2d 540 (1986); *State v. Cabral*, 228 Kan. 741, 744-45, 619 P.2d 1163 (1980).

Bledsoe also cites *State v. Halloway*, 256 Kan. 449, 886 P.2d 831 (1994). In *Halloway*, the victim was an unwilling companion for the entire period before the rape. Halloway's car became lodged on a railroad track. When Halloway could not move the car off the tracks, the victim escaped to the highway. Halloway hit her with a jack handle or crowbar and forced her to return to the car. He did not rape her in his car. Rather, he dragged her into the woods, away from the highway. We found the evidence sufficient to support the verdict of aggravated kidnapping. 256 Kan. at 452-53.

The State observes that Colonel Knoebel heard a woman screaming. It argues that even if C.A. was voluntarily with Bledsoe, at the point of screaming she was no longer acting with consent. The State also contends that C.A. had to have been moved from the location near the dairy because the colonel did not hear a shot in that location.

The location where the shooting to the back of C.A.'s head took place was never determined. Bledsoe reasons that although the colonel heard screaming, he did not see who was screaming and did not know precisely where the screams originated.

The evidence at trial shows that Colonel Knoebel heard a young woman screaming, "[P]ease don't hurt me, somebody help me, please don't hurt me." Even if C.A. was voluntarily with Bledsoe, at that point she no longer was acting with consent. The jury could have concluded that she had to have been moved from that location to another. It also could have concluded that Cody witnessed C.A. being shot. Cody was not present until after Bledsoe picked him up from the babysitter.

We have reviewed the cases cited by Bledsoe and the State and conclude the evidence of C.A.'s movement is sufficient to support

the jury's finding that C.A. was taken or confined against her will by force or threat with the intent to inflict bodily injury upon her or to terrorize her. There was sufficient evidence of a taking or confining to support an aggravated kidnapping conviction.

### Aggravated Indecent Liberties with a Child

Next, Bledsoe argues the State failed to prove the elements of aggravated indecent liberties with a child beyond a reasonable doubt in violation of the due process guarantee of the 5th and 14th Amendments to the United States Constitution. Bledsoe asserts that there was no evidence to support a finding that C.A. was alive during the alleged crime of aggravated indecent liberties with a child. The due process argument and whether C.A. was alive or not was not raised before the district court. It is well established that a point not raised in the district court cannot be raised for the first time on appeal. *State v. McDaniel*, 255 Kan. 756, 765, 877 P.2d 961 (1994). Bledsoe, in his motion for a new trial, argued that there was no evidence to support his aggravated indecent liberties conviction. We disagree.

C.A.'s T-shirt and bra were found pulled up above her breasts. Dr. Erik Mitchell, a forensic pathologist, concluded that the clothing was probably pulled up over her breasts before she was shot in the chest because of the location of the holes in the garments. He testified:

"A. [To raise the clothing to the position it was found] you'd have to get down to wherever it is and pull it up, because it is up over the breast, I mean it's really, it's up and folded over the breast.

. . . .

"A. It's usually what we see [when] somebody [is] trying to move clothing rather than move a body."

Tom testified that Bledsoe told him that C.A.'s shirt and bra were pulled up over her breasts. Tom said he asked Bledsoe if he had raped or sexually abused C.A. According to Tom, Bledsoe said, "Yes, no, I don't know." We are satisfied that the evidence before the jury, when viewed in the light most favorable to the State, is such that a reasonable person could weigh the evidence and draw

reasonable inferences therefrom and conclude, beyond a reasonable doubt, that Bledsoe committed indecent liberties with C.A.

## Admitting Hearsay Evidence

Next, Bledsoe contends that the district court erred by admitting the hearsay statements of his 2-year-old son Cody implicating either Tom or Bledsoe in the crime. He advances a violation of his confrontation rights, arguing that (1) the State failed to show that the statements bore sufficient indicia of reliability, and (2) the statements were not corroborated. First, we note, as does Bledsoe, that there was no objection to the testimony regarding Cody's statements. We will not reverse by reason of an erroneous admission of evidence unless a timely specific objection appears of record. K.S.A. 60-404. Second, the statements about which Bledsoe now complains were elicited for the first time *by Bledsoe* on cross-examination of Rosa Bolinger. Defense counsel read into the record Captain Turner's written narrative report of his interview with Rosa. When a defendant opens a subject on direct or cross-examination, the State may develop and explore various phases of that subject. *State v. Chatmon*, 234 Kan. 197, Syl. ¶ 4, 671 P.2d 531 (1983).

## The Officer's Testimony

Bledsoe also contends that the district court erred by (1) allowing testimony concerning a joint interview with Tom and Bledsoe and (2) allowing an officer to give opinion testimony regarding the veracity of Tom's statements to police. Bledsoe's initial problem on this issue is that he did not object to the officer's testimony. See K.S.A. 60-404.

In a motion in limine, Bledsoe requested that the State refrain from introducing evidence regarding polygraph tests and results. At the hearing on the motion, the parties agreed that the tests and results should not be introduced. The district court granted Bledsoe's motion to suppress, ordering that "[t]he State shall be precluded from introducing the results of the interview of KBI Agent Johnson with Floyd Bledsoe and Tom Bledsoe."

At trial, during the cross-examination of defense witness Officer Randy Carreno, the following took place:

"Q. Were you present when [Tom], during one of those interviews . . . when he was actually confronted with Floyd?

"A. Yes, I was.

"Q. Explain to the jury what happened.

"A. There was an agreement that was made during the course of the interview . . . when I was interviewing Floyd Bledsoe, that Tom would be brought in the interview room and at that time it would be Floyd, Tom and I discussing the homicide of [C.A.]. Tom entered the room and the one thing that I noted quickly was that Tom got as far away from Floyd as he possibly could and put his back to the wall. The next thing that I noticed was that Floyd was, he just stared him down, more of a intimidation type factor, and I could tell that Tom was very, very uneasy being in that room at that time.

"Q. Did Tom's demeanor change compared to what it was before?

"A. He, the impression that I got from Tom Bledsoe was that at that point in time he became strong, and I don't know how to explain that, but he . . . challenged Floyd, he challenged Floyd in a way that in my opinion he was able to stand up for the first time in front of Floyd and tell him the truth, to state the truth.

"Q. What did he say?

"A. That he wanted me to know the truth, he wanted everybody to know the truth, and that he wasn't going to hide the truth anymore, and I asked him what the truth was.

"Q. And what did he say?

"A. The information that he gave me was that it was Floyd Bledsoe that killed [C.A.]."

Bledsoe contends that the contents of the interview were inadmissible under the district court's order. However, it is apparent from the transcript that the detective was not questioned about the polygraph testing or results. There was no violation of a court order.

A review of the detective's testimony shows that although he testified that he was familiar with interviewing techniques that are helpful in determining whether a suspect is being truthful or deceptive, he was not vouching for Tom's credibility. Instead, the context shows that he referred to the "truth" according to Tom. Thus, the jury was presented with Tom's version of what happened and was left to weigh the credibility of his statements. We find no error.

Affirmed.

Davis, J., not participating.

Brazil, Chief Judge Retired, assigned