No. 88,001

STATE OF KANSAS, *Appellee,* v. HORACE BELL, JR., *Appellant.*

(80 P.3d 367)

Opinion filed December 12, 2003.

*Robert M. Miles*, of Robert M. Miles, P.A., of Liberal, argued the cause and was on the brief for appellant.

*Melissa G. Johnson,* assistant county attorney, argued the cause, and *Don L. Scott,* county attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Horace Bell, Jr., appeals his convictions of felony murder, criminal discharge of a firearm at an occupied motor vehicle, and criminal damage to property. He contends that the district court should have instructed the jury on self-defense and involuntary manslaughter, his taped and written statements should have been suppressed, and that insufficient evidence supported his felony-murder conviction. We affirm.

On May 15, 2000, the defendant, Chad Humiston, Keontis Hall, Sergio Pineda, Ronald Madden, and others were gathered at the home of Jonathan Baptista. Humiston, Madden, and Baptista left the house and went to a gas station where they encountered Ernie Bishop and Shawn Cox, who appeared to be yelling and throwing their hands up at them from Kansas Avenue. Humiston, Madden, and Baptista got into their El Camino and began following Bishop and Cox, who were walking down Kansas Avenue.

Bishop and Cox advised Humiston, Madden, and Baptista that they had not thrown their hands up at them but had been waving to some girls. An argument erupted between the two groups, and Bishop said that he would get 50 of his "skinhead homies" and come back and kill all of them in about 10 minutes. Humiston, Madden, and Baptista said they would be back with a bunch of friends in 15 minutes.

Humiston, Madden, and Baptista returned to Baptista's home to recruit their friends to fight Bishop, Cox, and their friends. Baptista testified that he went into the bedroom and discussed a plan with Humiston and the defendant. According to the plan, the defendant would drive the El Camino while Baptista would be in the back with a gun; the defendant would drop Humiston off a block ahead of the meeting place and drive the El Camino to where the initial argument started. At that time, Humiston would run up from behind, shoot them, and then jump in the back of the El Camino with Baptista to make it look like a drive-by shooting. Because the defendant said he was too nervous to drive, the boys agreed to keep the same plan but have the defendant get his gun and ride in the back with Baptista.

At trial, Humiston denied making any type of agreement to shoot anyone and he denied knowing that anyone was going to use a firearm. Hall testified that the defendant was outside of the house the entire time after he returned with Humiston and Baptista, but he admitted on cross-examination that he did not know if the defendant could have gone inside during that time.

After Baptista got his .22 caliber semiautomatic handgun, Baptista, Hall, and Pineda got into the El Camino, while Humiston, Madden, Russell, and the defendant got into another car. They

drove to Arby's restaurant where the defendant got his .22 caliber revolver out of the trunk of Roman Hernandez' vehicle. The defendant got into the El Camino with Hall and Baptista. Hall drove the El Camino to the place where the argument started, but neither Cox, Bishop, or their friends were there. Baptista and Pineda got out and began looking for them on foot while the others drove around the neighborhood looking for them.

During this time, Bishop and Cox had walked to a friend's apartment, discovered he was not home, and walked back down Kansas Avenue to a car wash where they saw Anthony McCain. They told McCain about the confrontation, and he offered to give them a ride home. When they left the car wash, McCain was the driver, Bishop sat in the passenger seat, and Cox sat in the back seat. McCain drove Bishop and Cox to their friend's apartment, but he was still not home.

Humiston, Madden, and Russell saw Bishop and Cox at the car wash. Hall and the defendant picked up Baptista and Pineda. The defendant got out of the front of the El Camino and got in the back with Baptista, and Hall drove them to the car wash. The El Camino followed the Saturn driven by McCain down Kansas Avenue and sped up to catch up with the Saturn. The vehicle with Humiston, Madden, and Russell was delayed by a stoplight and was not present during the incident. The Saturn turned on Harold Boulevard, an area surrounded by vacant fields, and pulled over.

The El Camino stopped catty-cornered to the Saturn. Baptista claimed at trial that he saw the driver drop his head as if he was reaching down for a gun. Baptista thought their lives were in danger and they had been lured to an isolated area to be ambushed. Baptista yelled, "They've got a gun," and he and the defendant started shooting at the Saturn.

When interviewed the day after the incident, the defendant admitted that he shot at the Saturn. His statement at that time was that Baptista told him it was "now or never" before they started shooting. Hall testified at trial that when he heard gunshots he looked back and saw Baptista shooting and the defendant lying on his stomach in the bed of the El Camino.

McCain died as a result of the shooting, and the defendant was charged with first-degree premeditated or felony murder, two counts of attempted first-degree murder of Bishop and Cox, criminal discharge of a firearm at an occupied vehicle, and criminal damage to property. In connection with this incident, Baptista entered into an agreement with the prosecutor, pled guilty to reduced charges, and testified for the State at trial.

At trial, Bishop claimed that he did not know they were being followed until the car revved up and the windows started shattering. McCain was shot in the head and the abdomen, and Bishop was shot in the knee. Bishop and Cox jumped from the vehicle and ran away through a field. Bishop was taken to the hospital and treated for a gunshot wound to his knee. He was not able to identify the shooters or the vehicle involved in the incident.

Hall, Pineda, Baptista, and the defendant left the scene, dropped the El Camino off at Humiston's home, and ran to J.D. Hale's home to hide the guns. Hall and the defendant separated from Pineda and Baptista at that time.

An eyewitness observed a small car with its headlights on stop at the intersection and a larger car without its headlights on pull up beside it. He heard a noise that sounded like firecrackers and then saw sparks or a glow between the cars, two silhouettes running from the smaller car, and the larger car go in reverse down the street. Suspecting a shooting, he called the police.

Officer Mark Caffalette arrived at the intersection of Harold Boulevard and Mission in response to a report of gunshots, and he observed McCain sitting in the driver's seat of the Saturn, which was still running. His upper body was covered in blood and he had a small hole in the back of his head. The Saturn had 11 bullet holes or marks and the driver's side windows and the windshield were broken. No weapons were found inside the car.

Dr. Hubert Peterson conducted McCain's autopsy and observed that McCain had a fatal gunshot wound to the head and a nonfatal gunshot wound to his abdomen. The .22 caliber bullets in the wounds were examined by the State's firearms expert, Carlo Rosati. The parties stipulated that the bullet removed from McCain's head had markings inconsistent with being fired by the defendant's re-

volver. However, the bullet in McCain's abdomen had markings consistent with being fired by the defendant's revolver and inconsistent with the semiautomatic handgun fired by Baptista.

Baptista was interrogated on the morning of May 16, 2000, and his statement enabled Lieutenant Timothy Neal to recover a semiautomatic .22 caliber handgun and a .22 caliber revolver at Hale's residence. The defendant's fingerprint was discovered on the revolver and Baptista's fingerprint was on the semiautomatic handgun.

The defendant was also interrogated on the morning of May 16, 2000. During this interrogation, he admitted to getting his revolver, following the Saturn, and shooting at the car with Baptista. Prior to trial, he sought to suppress his incriminating oral and written statements as involuntary.

At the suppression hearing, Detective Stephen Hall testified that he and Lieutenant Neal picked the defendant up at his high school on the morning of May 16, 2000. The defendant was informed of his *Miranda* rights, handcuffed, and told he was being charged with attempted first-degree murder. The defendant testified that Lieutenant Neal told him he was guilty of three counts of attempted murder, that it would be first-degree murder if the victim died, and that he was looking at a lot of jail time. He stated that these statements affected his decision to make the later confession. Neither Detective Hall or Lieutenant Neal recalled these comments being made. The defendant was taken to the police station where he was interviewed by Detective Hall and Sergeant Brian Miller. A videotaped interview was played during the suppression hearing.

The videotape showed the officers in chairs facing the defendant, who was sitting at a table. The interview began with Detective Hall informing the defendant of his *Miranda* rights again, and the defendant signed a waiver. However, the defendant testified that he did not understand that he was waiving his right to an attorney and that he did not have time to read the waiver before signing it. He admitted that he had been arrested twice before but had never been given the *Miranda* warning. The defendant never told the officers that he had changed his mind about waiving his rights during the interview.

The defendant began the interview by denying his involvement in the shooting. Sergeant Miller stated that he was tired of the defendant's attitude, that they had talked to his friends and knew the whole story, that they could test his hands for nitrate, and that he should tell the truth or suffer the consequences. Sergeant Miller did not raise his voice or stand up during these exchanges with the defendant. The defendant appeared to get frustrated with Sergeant Miller during the interview. The defendant asked why Sergeant Miller was taking part in the interview. The defendant indicated that he only wanted to talk to Detective Hall. Sergeant Miller left the interview room, telling the defendant that he would see him again.

The defendant exhibited a wide range of emotions during the remaining interview with Detective Hall. He cried at some points during the interview, particularly when he talked about how they thought he was guilty and he was to going to jail for life. At the suppression hearing, the defendant testified that he had used alcohol and marijuana within 24 hours of the interview, and he had smoked marijuana a couple of times on the morning that he was arrested at school. However, Detective Hall testified that the defendant did not appear to be under the influence of any alcohol or drugs during the interview, that his speech was not slurred, his eyes were not bloodshot, and he did not smell of any intoxicant.

The defendant asked to see his mother twice toward the latter part of the approximately 1 hour interview. Detective Hall made one unsuccessful attempt to locate her, and Detective Hall told the defendant that he could see his mother after he completed his written statement. The defendant's mother had arrived at the police station around the time the interview began and she asked to see the defendant. While Detective Hall continued to conduct the interview, Sergeant Miller told her that she could not see the defendant until the interview was completed.

The district court found that the statements were voluntary, reasoning that the defendant was given the required *Miranda* warning, that he was not disadvantaged based on his age, that he was, in essence, interviewing the police officer, and that he was not compelled or threatened in any matter. The videotaped statement and

the written statement were admitted at trial over the defense's objection.

The jury was instructed on the alternate theories of premeditated and felony first-degree murder, in addition to the lesser included offenses of second-degree murder and voluntary manslaughter. The defendant's request for self-defense and involuntary manslaughter instructions was denied. The defendant was convicted of felony murder, criminal discharge of a firearm at an occupied motor vehicle, and criminal damage to property. He was sentenced to life imprisonment on the felony-murder charge, to run consecutive to concurrent 12- and 6-month imprisonment terms on the remaining charges.

## Discussion and Analysis

### 1. Trial court's denial of self-defense and involuntary manslaughter instructions

In a criminal action, the district court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the district court's refusal to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. *State v. Barnes*, 263 Kan. 249, 265, 948 P.2d 627 (1997).

### Self-Defense

The defendant requested a self-defense instruction based on K.S.A. 21-3211: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." However, K.S.A. 21-3214(1) provides in part that the justification described in 21-3211 is not available to a person who "[i]s attempting to commit, committing, or escaping from the commission of a forcible felony." See *State v. Jacques*, 270 Kan. 173, Syl. ¶ 1, 14 P.3d 409 (2000).

K.S.A. 21-3110(8) defines a forcible felony as "any treason, *murder*, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy *and any other felony which involves the use or threat of physical force or violence against any person.*" (Emphasis added.)

Criminal discharge of a weapon at an occupied vehicle, the underlying felony in this case, is considered a forcible felony. See *State v. Mitchell*, 262 Kan. 687, 694, 942 P.2d 1 (1997). As the defendant was charged with the forcible felonies of first-degree murder and criminal discharge of a firearm at an occupied vehicle, he was excluded from a self-defense instruction by K.S.A. 21-3214(1).

Moreover, the facts of this case do not support a self-defense instruction. The provisions of K.S.A. 21-3211 limit the use of force against an aggressor to those circumstances when and to the extent "it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." Thus, before a defendant is entitled to a self-defense instruction, relevant evidence must establish that (1) the defendant honestly and sincerely believed it would be necessary to kill in self-defense, and (2) a reasonable person would have perceived the necessity of self-defense. See *State v. Sims*, 265 Kan. 166, Syl. ¶ 4, 960 P.2d 1271 (1998).

Although the defendant argues this test was satisfied by the evidence that Baptista warned him that Bishop and Cox were intending to lay them 6 feet in the ground; that Baptista yelled they had a gun when they pulled up to the Saturn; that Baptista claimed he fired in self-defense; that the eyewitness could not tell what direction the sparks between the cars were moving; and that the seven bullets could not be *positively* identified as coming from either of the recovered guns, there was no evidence presented that the defendant honestly and sincerely believed it would be necessary to kill in self-defense. The defendant's own written statement demonstrates otherwise:

"We followed them for a minute and then Keontis speeded up were [*sic*] we would be on the left hand side of them. John told me now or never, jumped up and started shooting over me. I told him don't shoot for the heads let's just send

a message. Then I got up I know I didn't shoot for the head because I shot at the back door. When I was done I saw the glass break were [sic] John was still shooting. Even though I personally never shot or killed someone I knew they were hit. I swear to God I [sic] sorry and didn't want to hit anyone but that can't change what took place. I hope none of them die or be injured for life. But all I can say is I never aimed nor shot at the front door. A couple went in the air because when he started shooting I had to get up were [sic] I didn't have a good aim and shot. As far as I know everyone there knew what was going on because everyone saw Bap. with his gun. But from what they told John about getting 50 of their own and getting us. I knew something was gonna happen that night. To me I thought either us or them. Because their [sic] known for hurting family members and I can't lose my brother or mom not right now in life. Its hard knowing what you did was wrong, but I didn't aim to hit only scare."

Although the defendant said it was "either us or them," he repeatedly stated that he did not intend to shoot any of the occupants of the Saturn. If he did not want to shoot any of the occupants, he obviously did not believe it was necessary to kill in self-defense. Viewing the evidence in the light most favorable to the defendant, he was not entitled to an instruction on self-defense.

### Involuntary Manslaughter

The defendant argues the district court erred in denying his request for an involuntary manslaughter jury instruction. As the defendant was instructed on felony murder, the following standard of review applies when considering the duty to instruct on lesser included offenses:

"When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is only when the evidence of the underlying felony is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required. [Citations omitted.]" *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001) (quoting *State v. Strauch*, 239 Kan. 203, 218-19, 718 P.2d 613 [1986]).

In this issue, the defendant does not suggest that the underlying felony of criminal discharge of a firearm at an occupied vehicle was supported by weak, inconclusive, or conflicting evidence. Bishop, Cox, and McCain were in the Saturn at the time of the shooting. The defendant admitted shooting at the car and Baptista verified

this at trial. The Saturn had numerous bullet holes and the bullet in McCain's abdomen was consistent with being fired from the defendant's revolver.

However, the defense theory at trial was that the defendant did not shoot at the car. Hall testified that he saw the defendant lying in the bed of the El Camino while Baptista was shooting, and Humiston did not see the defendant with a gun. However, this testimony does not necessarily have to be viewed as conflicting, as it is in line with the defendant's earlier statements that Baptista fired first, that the defendant started shooting, and that Baptista starting shooting again after the defendant stopped. Humiston did not witness the shooting, as he arrived when the El Camino was pulling away. Because the evidence supporting the underlying felony was not weak, inconclusive, or conflicting, the defendant was not entitled to an involuntary manslaughter instruction.

Even if we were to conclude that this evidence was conflicting to the point that the lesser included offense of involuntary manslaughter should be considered, it is not applicable in this case. Involuntary manslaughter is the unintentional killing of a human being committed recklessly, or in the commission of a crime other than an inherently dangerous felony, or during the commission of a lawful act in an unlawful manner. K.S.A. 2002 Supp. 21-3404.

The defendant's proposed instruction only referred to involuntary manslaughter committed during the commission of a lawful act in an unlawful manner. Likewise, on appeal, the defendant argues he was entitled to an involuntary manslaughter instruction because the jury could find that he committed a lawful act of self-defense but did so in an unlawful manner. We have concluded that the defendant was not entitled to a self-defense jury instruction. His contention that the court failed to instruct on involuntary manslaughter fails.

## Suppression of his statement

The defendant argues that his oral and written statements made in the course of a custodial interrogation were involuntary and should have been suppressed by the district court.

" 'The ultimate issue of voluntariness of a confession is a legal question requiring independent appellate determination. See *Arizona v. Fulminante*, 499 U.S. 279, 287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995). " 'In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment.' [Citations omitted.]" ' *State v. Sanders*, 272 Kan. 445, 452, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002) (quoting *State v. Baston*, 261 Kan. 100, 104-05, 928 P.2d 79 [1996])." *State v. Makthepharak*, 276 Kan. 563, 566-67, 78 P.3d 412 (2003).

A defendant's waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. The trial court's findings that the defendant voluntarily, knowingly, and intelligently waived his or her rights will not be disturbed on appeal if it is supported by substantial competent evidence. *Makthepharak*, 276 Kan. at 567.

The defendant contends a review of the factors discussed in *State v. Ramos*, 271 Kan. 520, 525, 24 P.3d 95 (2001), supports his argument. *Ramos* mandates that the following factors be considered in determining whether the confession of a juvenile is voluntary: " '(1) the age of the minor, (2) the length of the questioning, (3) the minor's education, (4) the minor's prior experience with the police, and (5) the minor's mental state.' " 271 Kan. at 525 (quoting *State v. Davis*, 268 Kan. 661, 674, 998 P.2d 1127 [2000]).

The district court did not explicitly consider these factors in this case. It did find the statements were voluntary, reasoning that the defendant was given the required *Miranda* warnings, that he was not disadvantaged based on his age, that he was in essence interviewing the police officer, and that he was not compelled or threatened in any matter.

Although this court has not required the trial court to expressly review the *Ramos* factors on the record, we have strongly suggested that the better practice is for the trial court to do so and have in the past chastised trial courts for failing to make such findings. See *Davis*, 268 Kan. at 675. Nevertheless, where the trial court has made a finding that the accused's statements were voluntary, this court's standard on review is whether the trial court's findings are based on substantial evidence. Where the accused is a juvenile, this

court exercises the greatest care in assessing the validity of the confession. In determining whether a confession is voluntary, consideration is given to the totality of the circumstances and great reliance is placed upon the finder of fact. *Davis*, 268 Kan. at 675.

Review of the *Ramos* factors supports the district court's conclusion finding that the statements were voluntary. The defendant was 16 years old at the time of the interview. Only juveniles under 14 years of age must be given an opportunity to consult with a parent before waving rights to an attorney and against self-incrimination. See *In re B.M.B.*, 264 Kan. 417, 432, 955 P.2d 1302 (1998). Bell was a sophomore in high school and possessed average intelligence. The entire interview only lasted approximately an hour, and the questioning was not continuous.

Although the defendant had never been *Mirandized*, he had been arrested on two previous occasions. Although the defendant claimed that he had smoked marijuana within hours of the interview, review of the videotape supports Detective Hall's testimony that the defendant did not appear to be under the influence. His speech was clear and coherent, he did not act sluggish or tired, and he actively engaged in conversation with the officers.

In addition to these factors, the defendant argues that the court must also look to the fairness of the law enforcement officers in conducting the interrogation. See *State v. Minor*, 268 Kan. 292, 297-98, 997 P.2d 648 (2000). Bell contends it was unfair for the officers to tell him that he would be going to prison for life for first-degree murder, to prevent him from speaking with his mother, and to use the good cop/bad cop routine. He contends Sergeant Miller used his physical presence and intimidating personality, bated him with alleged comments made by friends, and accused of him of not being honest, while Detective Hall spoke in a quiet voice and urged the defendant to confess.

The defendant's allegations of unfairness do not warrant a finding that the statements were involuntary. First, the officers and the defendant disagreed over whether these comments were made upon his arrest, and it is not the function of this court to reweigh the credibility of the witnesses on appeal. See *State v. Bledsoe*, 272 Kan. 1350, 1359, 39 P.3d 38 (2002). Moreover, Detective Hall

repeatedly assured the defendant that he would not necessarily have to spend life in prison, and it did not matter if Sergeant Miller told him that he was guilty of murder because that determination could only be made by the judge.

Second, the officers' refusal to allow Bell to see his mother does not render the statements involuntary under the analogous case of *State v. Orr*, 262 Kan. 312, 940 P.2d 42 (1997). The *Orr* court addressed whether an officer's refusal to let a 17-year-old defendant call his parents during a 4½-hour custodial interrogation was a per se violation of his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution. In the interview, Orr waived his *Miranda* rights, did not appear to be under the influence, answered the questions in an appropriate manner, was not threatened or promised anything in the interview, did not ask to end the interview, and did not request counsel. The court declined to find a per se violation and concluded that the confession was voluntary based on the totality of the circumstances.

Finally, it is evident from the videotape that Sergeant Miller was more forceful and direct in his questioning than Detective Hall. When the defendant denied involvement, Sergeant Miller told the defendant that they already knew the whole story from speaking with his friends, and he described the defendant's involvement in the crime. Sergeant Miller did make some questionable comments to the defendant. For example, he told the defendant to tell the truth or suffer the consequences. When the defendant said that he did not care about the stripes on the officer's uniform, Sergeant Miller told the defendant that the defendant was going to have a lot more stripes of his own, seemingly in reference to a prison uniform. When leaving the interview, Sergeant Miller told the defendant that he would see him again.

These comments, while seemingly improper, do not affect the voluntariness of the defendant's statement when viewing the entire interview as a whole. Sergeant Miller did not raise his voice, stand up, or act in a threatening manner toward the defendant during the course of the interview. The defendant's will was not overborne, as he frequently argued with Sergeant Miller and eventually

asked him to leave the interview. Moreover, Sergeant Miller left the interview after a short period of time and did not return.

Nothing in Detective Hall's demeanor could be described as threatening or improper. He was professional, polite, and attempted to calm the defendant down on several occasions. As such, even if the officers were engaged in a good cop/bad cop scenario, their actions were not so unfair or coercive as to render his statements involuntary. Under the totality of the circumstances, the trial court's conclusion that the statements were voluntary and its admission of the defendant's written statements and the videotape of the defendant's interrogation were supported by substantial competent evidence.

## Sufficiency of evidence for felony murder

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review on appeal is whether, after review of all of the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Davis*, 275 Kan. 107, 118, 61 P.3d 701 (2003).

The defendant argues that insufficient evidence was presented to support his felony-murder conviction under K.S.A. 21-3401(b). Felony murder is the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436." K.S.A. 21-3401(b).

The State had to prove that the defendant or another killed McCain while in the commission of the crime of discharging a firearm at an occupied motor vehicle. Criminal discharge of a firearm at an occupied vehicle is the malicious, intentional, and unauthorized discharge of a firearm at a vehicle in which there is a human being. K.S.A. 2002 Supp. 21-4219(b). The State did not have to prove the existence of a conspiracy to commit a homicide, as suggested by the defendant.

The day after the shooting, the defendant admitted that he had shot at the car which was occupied by McCain, Bishop, and Cox. Baptista verified at trial that he and the defendant shot into the car. Although the defendant challenges the credibility of Baptista's

testimony, this court does not reweigh the evidence or pass on the credibility of witnesses. *Bledsoe*, 272 Kan. at 1359.

Although the bullet causing the fatal wound was not fired from the defendant's gun, the bullet in McCain's abdomen was consistent with being fired by the defendant's revolver and inconsistent with the semiautomatic handgun fired by Baptista. Viewing the evidence in the light most favorable to the prosecution, sufficient evidence supports the felony-murder conviction.

Affirmed.