**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 26, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FLOYD BLEDSOE,

      Petitioner-Appellee,

v.

LOUIS BRUCE, Warden, Hutchinson
Correctional Facility; STEPHEN N.
SIX, Attorney General for the State of
Kansas,

      Respondents-Appellants.

No. 08-3172

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 5:07-CV-3070-RDR**)

---

Jared S. Maag, Deputy Solicitor General (Stephen N. Six, Kansas Attorney
General, with him on the brief), Topeka, Kansas, for Respondents-Appellants.

Alice Craig White (Elizabeth Seale Cateforis, with her on the brief), Paul E.
Wilson Defender Project, University of Kansas School of Law, Lawrence, Kansas,
for Petitioner-Appellee.

---

Before **TACHA, BRISCOE,** and **O'BRIEN**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Louis Bruce, Warden, Hutchinson Correctional Facility, and Stephen Six, Kansas Attorney General (collectively, the "state") appeal the district court's grant of habeas relief under 28 U.S.C. § 2254. The district court concluded the petitioner, Floyd Bledsoe (Floyd), was denied his constitutional right to the effective assistance of counsel. Floyd had been previously convicted by a jury of first degree murder, aggravated kidnapping, and aggravated indecent liberties with a child. The Kansas state courts had affirmed his convictions and had denied state post-conviction relief. Floyd was sentenced to life imprisonment on the murder charge, with consecutive sentences of 155 months' imprisonment for the aggravated kidnapping charge and 41 months' imprisonment for the aggravated indecent liberties charge. We exercise jurisdiction under 28 U.S.C. § 1291, and reverse the district court's grant of habeas relief.

I

"C.A.," who was fourteen years old at the time, was murdered on Friday, November 5, 1999. She died from gunshot wounds caused by one shot to the back of the head and three additional shots to her chest and arm. She was found buried under plywood boards in a trash heap with her shirt and bra raised above her breasts. A jury convicted Floyd of murdering, kidnapping, and taking indecent liberties with C.A.

At the time of her murder, C.A. was living near Oskaloosa, Kansas, with Floyd, Floyd's wife, Heidi Bledsoe (Heidi), and Floyd and Heidi's two young

2

sons, Cody and Christian. C.A. was Heidi's younger sister.

On Friday, November 5, 1999, C.A. rode the school bus home after school, arriving at around 4:20 p.m. Robin Meyer, one of C.A.'s friends, stopped by the Bledsoes' house at around 5:00 p.m. and saw C.A.'s coat and bag in the living room, but no one was home. C.A. likely disappeared sometime between 4:20 and 5:00 p.m. A hunter testified that at about 5:30 p.m. he heard a woman scream and the words "please don't hurt me, somebody help, please don't hurt me" coming from near the dairy where Floyd worked. ROA, Vol. III, at 518-19. The hunter testified he did not hear any gunshots. After C.A. failed to show up for church Friday night, she was reported missing.

Floyd's older brother, Tom Bledsoe (Tom), was a suspect. Tom turned himself in to police on Sunday, November 7, and confessed to the police that he had murdered C.A. Tom, through his attorney, took the police to C.A.'s body. C.A. was killed with Tom's gun, a nine millimeter semiautomatic pistol purchased by Tom about two weeks before the murder. The gun was later found in Tom's bedroom, along with shells matching the bullets fired into C.A.'s body. No fingerprints were found on the gun. C.A.'s body was located in a trash dump in the field behind where Tom lived with his parents.

Dr. Erik Mitchell, an expert forensic pathologist, testified at trial that: (1) the shot fired to the back of C.A's head was a contact shot and was not fired at the location where C.A. was found; (2) C.A. had been placed in the burial site and

3

then shot in the chest; and (3) based on the position of the shots fired in C.A.'s chest in relation to her clothing, her shirt was raised up before the shots were fired. Dr. Mitchell opined that, based on the position and folds of C.A.'s shirt and bra, her clothes had been intentionally lifted rather than moved up by post-mortem dragging or sliding of her body. There was no evidence of trauma or injury to C.A.'s genitalia, which would be an indication of sexual assault or penetration. Additionally, tests for seminal fluid in C.A.'s underwear and on her body came back negative. Dr. Mitchell could not give any precise time of death because the earth where the body was found had kept the body cool, slowing decompositional changes.

Two days after his arrest, Tom changed his story and implicated Floyd in the murder. Tom and Floyd were not close. In fact, Tom testified that he hated Floyd, and that the brothers had not spoken for a month prior to C.A.'s disappearance. Tom said that while he was on his way to work the day after C.A.'s disappearance he saw Floyd's car and they stopped to talk. Each remained in his own vehicle, and Tom testified that his truck engine was running at the time. Tom has a hearing disability and reads lips. Detective Randy Carreno testified that Tom answers questions that he doesn't hear, and Tom guesses answers to questions that he doesn't hear. Tom testified that Floyd laid his head on the steering wheel and looked a little nervous. When Tom asked him what was wrong, Floyd said C.A. was dead. Tom testified that Floyd was mumbling, but he

4

heard him say "accidentally shot her." Id. at 609. Tom didn't know whether Floyd said "I" or "we" or some other pronoun or person accidentally shot her. Tom asked, "What?" Floyd said, "She's dead, accidentally shot her." Id. Tom testified that he asked Floyd why she was dead. Floyd shook his head and shrugged his shoulders. Tom also said that he asked Floyd whether he had raped C.A. or sexually abused her. Floyd responded, "yes, no, I don't know." Id. at 610. Floyd told Tom that he recalled her shirt and bra were above her breasts and that Floyd used Tom's pistol to shoot C.A.

Tom testified that immediately after this conversation with Floyd, Tom reached behind his truck seat and felt his pistol in the case. He said Floyd knew he kept a gun in his truck. Tom testified that Floyd told him he shot C.A. once in the back of the head and twice in the chest. When Tom asked where C.A. was, Floyd told him she was in the trash dump behind the house where Tom and their parents lived.

Tom also testified that Floyd threatened him in order to get him to take the blame for C.A.'s murder, if "anyone comes around snooping and stuff." Id. at 611. Floyd told Tom not to tell anyone, that Tom should take the blame for C.A.'s murder, and that if he did not, Floyd would tell people about Tom's past. At trial, Tom acknowledged that Floyd had threatened him in this way in the past to get what he wanted. Tom thought Floyd would reveal to members of his church that he had tried to have sex with a dog, had been caught with dirty

5

magazines, and had played with himself while watching dirty movies.

Tom testified at trial that when he got off work on Saturday night, he went home to "check[] to see if what Floyd told [him] was true." Id. at 618. He drove out to the trash dump and looked around; he did not see C.A.'s body but noticed that items in the dump and dirt had been displaced. Tom then went home and put his gun in his dresser drawer. He turned himself in the next day after leaving messages on the answering machine of the minister at his church. In the messages, Tom first said:

> Hi, Jim. This is Tom. I wanted you to be the first to know. I know I lied to you. I know where [C.A.] is. When you get this message I'm going to turn myself in to the police. I said–I wished I never did it. I hurt the church, I hurt God, most of all, I let everyone down. All I can say is I'm sorry. I'll pay for the rest of my life for what I've done. All I can ask is for the church to remain strong. Please forgive me. As a favor, please remember my mom and dad. Help them when they go through, help with the pain I'm about to–thank you, Jim. Sorry. Goodbye.

Id. at 633. Then, Tom said:

> Hi, Jim. Me again, Tom. Please help me and my dad–please help my mom and dad through this. Right now they're disappointed. I know that the church will be, too. All I can ask, forgive me for what I have done and I will pay for the rest of my life. I wanted to tell you in front of the church, but I didn't have enough guts. I'm sorry. I don't know what went through my mind. Right now you're probably pretty shocked. I wish I could turn the clock back, but I can't. Made my choice. I wish I didn't. Sorry. Bye.

Id. at 634-35.

Tom testified at Floyd's trial that he turned himself in for something he did

6

not do because he did not want people to know about his past. He said he also thought about wanting Floyd's children to grow up with a father in the home. A day or two after his arrest, Tom was "ashamed" about lying and talked with police again, this time implicating Floyd. Id. at 642. He testified that he felt ashamed, upset, and discouraged because Floyd told him he had killed C.A. and told him where C.A's body was.

Officers interviewed the brothers together and eventually arrested Floyd and released Tom. Detective Carreno testified at trial that when the brothers were in the room together, Tom stated that "[Tom] wanted [the officer] to know the truth, he wanted everybody to know the truth, and that he wasn't going to hide the truth anymore, and . . . the information that he gave [the officer] was that it was Floyd Bledsoe that killed [C.A.]." Id., Vol. IV, at 929.

Sheriff Roy Dunnaway testified that, during the search effort, after C.A. disappeared and before her body was discovered, Floyd asked him: "She's dead isn't she? Do you know if she's dead?" Id. at 789-90. When asked if these statements were consistent with the usual reaction in the disappearance of a fourteen-year-old, possibly a runaway case, Dunnaway said, "I think most people put them thoughts out of their mind and still have hope that she was going to be found, which I had hopes that she would be found, be, be alright. [Floyd's reaction] to me is unusual, yes." Id. at 790.

Detective Troy Frost testified regarding Floyd's interrogation. He said that

7

Floyd "got real emotional," Id., Vol. III, at 510, and said that Floyd had stopped at the trailer the afternoon C.A. disappeared. Later, and on a number of other occasions, Floyd denied having stopped by the trailer that day. Floyd also told Frost that he loved C.A. Frost testified that he believed Floyd had gone to the trailer the day C.A. disappeared and that Floyd was genuine about his feelings for C.A.

Rosa Bolinger testified that Floyd had considered pursuing a sexual liaison with C.A., and Brandi Wampler testified that Floyd wanted to know what C.A.'s plans were going to be when Floyd and Heidi divorced, which they were in the process of doing. Testimony from Bolinger and Wampler also suggested that C.A. was afraid to be alone at night at the trailer with Floyd.

Testimony at trial also included recitations of statements made by Floyd's two-year-old son, Cody, which implicated Tom and Floyd alternatively. Cody did not testify at trial. Cody's statements developed in the following manner: First, Floyd's counsel on cross-examination of Bolinger introduced Cody's statement that Tom killed C.A. Bolinger, who attended the same church as C.A. and Tom, testified that she heard Cody telling a story about Tom shooting C.A. Bolinger told police that on Monday, November 8, Cody had said: "Tom shot [C.A.], boom, boom, boom, boom, and dumped her in the water. Tom put his, Cody's, blanket around [C.A.] and also put [C.A's] blanket around her. . . . Tom closed [C.A.'s] eyes and he kissed her cheeks." Id., Vol. II, at 411. Bolinger said Cody

8

told her Tom put C.A. in a dump truck, and, before the body was discovered, Cody said that it was not a dump truck but a dump. On redirect, Bolinger indicated that, based on her perceptions, she did not think that someone told Cody these things, she believed he had actually seen them. Bolinger had not been called as an expert in child psychology or child development, and was testifying as a lay witness.

Heidi also testified about Cody's statements. Called by the state, she testified that she and Bolinger asked Cody what happened to C.A., and then witnessed Cody describe Tom shooting C.A., wrapping her in a blanket, and putting her in the dump. Heidi testified that she took Cody to C.A.'s grave site, and he said, "[C.A.], I didn't shoot you, it wasn't me." Id. at 434. A few days after Floyd's arrest, however, according to Heidi, Cody's statements changed; Cody started saying "Daddy" killed C.A. Id.

Floyd did not testify at trial. A jury convicted Floyd of first degree murder, in violation of Kan. Stat. Ann. § 21-3401(a), aggravated kidnapping, in violation of Kan. Stat. Ann. § 21-3421, and aggravated indecent liberties with a child, in violation of Kan. Stat. Ann. § 21-3504(a)(2)(A). Floyd was sentenced to life imprisonment for the first degree murder charge, 155 months' imprisonment for aggravated kidnapping, and 41 months' imprisonment for aggravated indecent liberties, all sentences to be served consecutively to one another. The Kansas Supreme Court affirmed his convictions on direct appeal. State v. Bledsoe, 272

9

Kan. 1350, 39 P.3d 38 (2002); ROA, Vol. I, at 5.

The Kansas Supreme Court affirmed Floyd's direct appeal, finding the evidence against Floyd to be sufficient to support the convictions. The Kansas Supreme Court concluded that the evidence supported Tom's version of events.

> C.A. was afraid to be alone at night with [Floyd]. [Floyd] loved C.A. and wanted to know where she would live after he and Heidi were divorced. C.A. was dropped off at the Bledsoe trailer by the school bus driver at 4:20 p.m. on Friday, November 5, 1999. [Floyd] admitted to two different law enforcement officers on two separate occasions that he had been at the trailer within minutes of her being dropped off. A friend found C.A.'s school bag at the trailer at 5 p.m., but C.A. was not there. [A hunter] heard screams of a young woman near the dairy where [Floyd] worked. [Floyd] could have been finished with his chores around 10:30 p.m. when he received a phone call from C.A.'s mother indicating she was going to call the police. He told her not to do so. He was absent from the dairy shortly thereafter. At 12:45 a.m., he picked up his son Cody from the babysitter and returned him to the babysitter 2 hours later at 2:45 a.m. The evidence suggests that Cody witnessed C.A. being shot and put in the ditch. Cody was only with [Floyd] when he was not at the babysitter's home. [Floyd] knew Tom kept a pistol in his truck. He admitted to Tom that he killed C.A. with Tom's gun. He admitted when Tom asked him if he raped C.A. that he knew her bra was over her breasts. He told Tom where the body was buried. [Floyd]'s father confirmed that [Floyd] was in his green car in the area after the roadside conversation between [Floyd] and Tom. [Floyd] informed his mother that he knew Tom did not kill C.A. and then attempted to blame his father.

272 Kan. at 1358-59.

Floyd filed for post-conviction relief in the Kansas courts pursuant to Kan. Stat. Ann. § 60-1507, alleging ineffective assistance of counsel and prosecutorial misconduct. The Kansas district court conducted an evidentiary hearing and

10

heard testimony from several witnesses including Floyd, his trial counsel John Kurth, and the prosecutor, James Vanderbilt. The Kansas district court denied Floyd habeas relief, ROA, Vol. I, at 180 (Mem. Decision), after concluding that Kurth provided effective counsel and that the prosecutorial misconduct issue had been waived. Id. at 183-84. The Kansas Supreme Court affirmed the denial of habeas relief. 283 Kan. 81, 150 P.3d 868 (2007); ROA, Vol. I, at 192. Specifically, the Kansas Supreme Court identified four deficiencies in Kurth's performance at trial, but found none of them to be prejudicial.

Floyd filed a habeas action in federal district court pursuant to 28 U.S.C. § 2254, alleging ineffective assistance of counsel. The district court granted Floyd habeas relief. Bledsoe v. Bruce, No. 07-3070, 2008 WL 2549029 (D. Kan. June 23, 2008) (hereinafter "Mem. and Order"); ROA, Vol. I, at 271. The district court found five deficiencies in Kurth's performance at trial, and concluded that the cumulative prejudice from all of counsel's errors required the grant of habeas relief. The state appealed. Floyd was released on bond pending the outcome of this appeal.

II

The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, provides for a deferential standard of review. In order to establish the right to federal habeas relief, the petitioner must show that the state court's determination was "contrary to, or involved an unreasonable application of,

11

clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). The petitioner cites only 28 U.S.C. § 2254(d)(1) as his basis for relief.

Under 28 U.S.C. § 2254(d)(1), a state-court decision is "contrary to" the law established by the Supreme Court (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a[n opposite] result." Williams v. Taylor, 529 U.S. 362, 405 (2000); Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004). A state-court decision is an "unreasonable application" of Supreme Court precedent (1) "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; Gipson, 376 F.3d at 1196. The state court's decision must be "more than incorrect or erroneous"; it must be "objectively unreasonable." Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); Wilson v. Sirmons, 536 F.3d 1064, 1073 (10th Cir. 2008).

12

We presume the state court's factual findings are correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Smith v. Mullin, 379 F.3d 919, 924-25 (10th Cir. 2004). We review the district court's application of the AEDPA's standards de novo. Goss v. Nelson, 439 F.3d 621, 626 (10th Cir. 2006) (citing Beem v. McKune, 317 F.3d 1175, 1179 (10th Cir. 2003) (en banc)).

B.      The Strickland Standard for Ineffective Assistance of Counsel

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684-86 (1984). A claim of ineffective assistance of counsel "is an attack on the fundamental fairness of the proceeding." Id. at 697. To establish an ineffective assistance of counsel claim, the defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." Id. at 687.

In determining if counsel's performance was deficient, we "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

In determining prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

13

the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

C.      The Kansas Supreme Court Applied the Correct Standard for Ineffective Assistance of Counsel

Floyd argues that the Kansas Supreme Court used a legal standard for the prejudice prong of the ineffective assistance of counsel analysis that is contrary to Strickland when it denied Floyd habeas relief. We disagree, and conclude, as did the federal district court, that the Kansas Supreme Court applied the correct standard for ineffective assistance of counsel.

The challenged language from the Kansas Supreme Court opinion is as follows:

> On the record before us, this was a difficult case. Two brothers accused each other of vile crimes. There was ample evidence to support each accusation. The jury, after weighing all of its substance and the credibility of the many witnesses, was persuaded that the State prosecuted the right brother. Although, in the hands of another defense lawyer, the case may have been tried to another conclusion, "may" is not good enough. In order to reverse, we must be convinced that, but for counsel's deficiencies, there was a reasonable probability of a different outcome. [State v. ]Gleason, 277 Kan. [624,] 644, 88 P.3d 218 [2004]. We are not so convinced. Floyd's trial, while not perfect, was fair. See State v. Johnson-Howell, 255 Kan. 928, 952, 881 P.2d 1288 (1994).

283 Kan. at 107.

14

Floyd argues that the "may is not good enough" and "while not perfect, was fair" language is contrary to Supreme Court precedent. Applee. Br. at 34. Specifically, Floyd cites to Woodford v. Visciotti, 537 U.S. 19, 22 (2002), to argue that the "may is not good enough" language implies a preponderance of the evidence standard for prejudice, when Woodford has made clear that the standard for prejudice is less demanding than the preponderance standard. Further, Floyd argues, "'May' is exactly good enough; it establishes a 'significant possibility,' which the Supreme Court has found good enough to establish a reasonable probability." Applee. Br. at 34 (citing Strickler v. Greene, 527 U.S. 263, 298 (1999) (Souter, J., concurring)). Justice Souter's concurrence opines that "significant possibility" is a better term than "reasonable probability" because the word "probability" often misleads courts into "treating [the phrase 'reasonable probability'] as akin to the more demanding standard, 'more likely than not.'" 527 U.S. at 298. However, despite its "may is not good enough" language, the Kansas Supreme Court was not misled and did not use the more demanding standard of "more likely than not." This is borne out by a full reading of the court's ruling.

We agree with the district court when it reasoned that, despite its "may is not good enough" language, the Kansas Supreme Court applied the correct standard:

> If by "may have been tried to another conclusion" the Kansas
> Supreme Court meant that there was a reasonable probability of a
> different outcome, then "may" is good enough to warrant habeas

15

relief. But, immediately thereafter the court stated that it was not convinced that there was such a reasonable probability. So, we assume that the court meant by "may" that there was a trivial probability, not a reasonable probability, that absent counsel's deficient performance, a juror would have found a reasonable doubt respecting [Floyd's] guilt.

Mem. and Order at 27-28.

The Kansas Supreme Court's opinion, when read in its entirety, correctly identifies Strickland as controlling precedent, applies the two prongs of the test for ineffective assistance of counsel, and concludes that it was not convinced that there was a reasonable probability of a different outcome had counsel not committed the errors identified. We note, as did the district court, that immediately after using the "may is not good enough" phrase, the Kansas Supreme Court stated: "In order to reverse, we must be convinced that, but for counsel's deficiencies, there was a reasonable probability of a different outcome." 283 Kan. at 107. The Kansas Supreme Court, despite its "may is not good enough" language, does not impermissibly apply the stricter "more likely than not" standard for prejudice.

Floyd also argues that the Kansas Supreme Court applied law contrary to Supreme Court precedent by injecting an impermissible overall fairness analysis into the ineffective assistance of counsel analysis. Floyd relies on Williams, 529 U.S. at 394-95, to argue that it is impermissible to "consider[] not only whether there was a reasonable probability that the outcome would have been different,

16

but also whether the result of the proceeding was fundamentally unfair or unreliable." Applee. Br. at 36. We have held that this "more onerous [fairness] standard was contrary to the Supreme Court's clearly established precedent in Strickland." Spears v. Mullin, 343 F.3d 1215, 1248 (10th Cir. 2003). However, as the district court stated, "it must be acknowledged that Strickland also speaks in terms of fairness and reliability, as well as in having confidence in the outcome. . . . We believe the Kansas Supreme Court's reference to fairness was speaking to having confidence in the reliability of the outcome." Mem. and Order at 28 n.2.

The Kansas Supreme Court's use of the term "fair," when the Strickland court explained that the very purpose of effective assistance is "to ensure a fair trial," 466 U.S. at 868 (emphasis added), is a kind of permissible shorthand. Cf. Holland v. Jackson, 542 U.S. 649, 655 (2004) (per curiam) (holding that it is permissible shorthand to use "probable" for the "reasonable probability" standard on the prejudice prong of the Strickland analysis for ineffective assistance of counsel). Further, a "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." Woodford, 537 U.S. at 24. Given that the Kansas Supreme Court correctly stated and applied the Strickland standard, the two phrases in the court's concluding paragraph, "may is not good enough" and "while not perfect was fair," do not support a conclusion that the Kansas Supreme Court erred. The Kansas Supreme Court neither applied

17

too strict a standard for prejudice, nor added an overall fairness requirement to the determination of whether counsel was ineffective. We do not read the ruling of the Kansas Supreme Court as applying a standard that is contrary to Supreme Court precedent.

D.     Defense Counsel's Deficiencies

The Kansas Supreme Court identified four errors defense counsel Kurth made during Floyd's trial: (1) an analogy to Susan Smith during voir dire; (2) introducing two-year-old Cody Bledsoe's hearsay statements; (3) not objecting to Detective Frost's improper credibility vouching for Floyd's interrogation statements; and (4) not objecting to factual errors in the prosecutor's closing arguments. The Kansas Supreme Court found that none of these errors prejudiced Floyd. The Kansas Supreme Court denied Floyd habeas relief because he failed the second prong of the Strickland test for an ineffective assistance of counsel claim—although there were four instances where the Kansas Supreme Court found counsel's representation to be deficient, none of the deficiencies were found by the court to be prejudicial when the totality of the evidence was considered. The federal district court, on the other hand, found that these deficiencies[1] were prejudicial and granted habeas relief. We agree with the Kansas Supreme Court that these deficiencies, whether considered individually or

---

[1] The district court added a fifth deficiency, that is, counsel's failure to object to Catherine Bledsoe's improper credibility vouching for Tom.

18

cumulatively, were not prejudicial, and, therefore, reverse the district court.

1.    Susan Smith Analogy During Voir Dire

The Kansas Supreme Court found that an analogy to Susan Smith, while objectively unreasonable and therefore deficient, was not prejudicial. Near the close of Kurth's voir dire, Kurth said to the prospective jury:

> Everybody remember the Susan Smith case? I know it's been a few years. Anybody recognize that name? Little gal that finally fessed up to drowning her little children? Anybody remember that now few years ago? Remember how she went on TV in front of everybody saying, asking where her children were and what happened and it was emotional, just like this one will be, and you wanted to believe her because you couldn't believe that somebody would do that to her own children. Ladies and gentlemen, I'm going to tell you that's the same kind of situation we have here. Don't decide this case until you've heard it all, because you're definitely going to hear two sides.[2]

ROA, Vol. II, at 362-63. The Kansas Supreme Court stated:

> We agree that Kurth's analogy to the Smith case during voir dire was objectively unreasonable. We can think of many better examples he could have cited to illustrate his point that the jury must reserve judgment until it had heard both sides of the story, examples that would not have had the unfortunate parallel of Smith's televised pleas for return of her children.

---

[2] Susan Smith made false reports that her children had been car jacked. She made several television appearances, pleading for information that would lead to the children's rescue. Nine days after making the false reports, she confessed to letting the car roll into a lake, drowning her children inside.

There are obvious, if unintended, similarities between Smith's pre-confession activities and Floyd's activities upon learning C.A. had disappeared. Floyd reported C.A. missing. Floyd publicly distributed flyers throughout town and appeared on the local news asking for information that would lead to C.A.'s rescue.

19

283 Kan. at 105. The Kansas Supreme Court ultimately found that the Susan Smith analogy, while "clumsy and regrettable," did not prejudice Floyd. Id. at 106.

The federal district court disagreed. The district court stated: "In a case where the credibility of Tom Bledsoe versus [Floyd Bledsoe] was critical, counsel's errors in voir dire placed [Floyd] in a bad light, arguably comparing his trial to a case involving a woman who had murdered her children and blamed another person on television before their bodies were found." Mem. and Order at 37.

We agree with the state that the district court failed to give the rulings of the Kansas Supreme Court proper deference under 28 U.S.C. § 2254(d). The district court agreed with the conclusion of the Kansas Supreme Court that the Susan Smith analogy painted Floyd in a bad light. However, the district court did not give proper deference to the Kansas Supreme Court's equally reasonable conclusion that the analogy was not prejudicial because the point of the analogy was the value of waiting to hear both sides of the story. The Kansas Supreme Court did not unreasonably apply Strickland to the facts before it. The Kansas Supreme Court's conclusion that the Susan Smith analogy was not prejudicial to Floyd was not objectively unreasonable under the AEDPA's standards.

2.    Cody Bledsoe's Hearsay Statements

During the trial, hearsay statements made by Floyd's two-year-old son,

20

Cody, were admitted into evidence during the examination of witnesses Rosa Bolinger and Heidi Bledsoe.

Kurth introduced Cody's hearsay statements that Tom killed C.A. in his cross-examination of Rosa Bolinger, a government witness. Specifically, Bolinger testified that she spoke with the sheriff's department to report that Cody had been "telling things that [Bolinger] didn't think a two-year-old should know." ROA, Vol. II, at 410. The testimony continued as follows:

> [Kurth]: Says Captain Turner spoke with you and you said that Cody would be three in March and he's saying things that concerned you and that he may have witnessed something or at least Tom, Tom Bledsoe may have told him something about the homicide. Is that correct?
>
> [Bolinger]: That he had got his information somewhere.
>
> [Kurth]: (Reading) Rose said Cody told her that Tom shot her, boom, boom, boom, boom, and dumped her in the water. Tom put his, Cody's, blanket around [C.A.] and also put [C.A.'s] blanket around her. Tom put her in a dump truck that goes beep, beep, beep. Tom closed [C.A.'s] eyes and he kissed her cheeks. There was red stuff on her legs. Shoes were wet and her shirt was wet.
>
> [Bolinger]: Yes. And later when I talked to Cody, because I talked to him sometime after that, and it was not a dump truck, it was a dump, and that was before I knew, you know, anything.

Id. at 410-11. Cody's statements that Tom committed the murder were inadmissible hearsay, offered for their truth. They also opened the door for the prosecutor to later admit additional hearsay statements made by Cody.

Bolinger testified on re-direct that she believed Cody had seen the murder

21

and was not just repeating what he had been told.

> [Prosecutor]: [B]ased on your perceptions did it appear to you that somebody had told [Cody] about [C.A's murder] or that he had seen it?
>
> [Bolinger]: No. He had seen it. It was real to him.

Id. at 413.

Heidi, also a government witness, testified on direct examination as follows:

> Rose had told me that Cody had been talking and she thought I needed to hear it so we took Cody downstairs, it was Rose and I and Cody. She said, Cody what happened to [C.A]? And he said, Uncle Tom shot [C.A], bang, bang, bang. . . . I, I believe he said we, or he wrapped her in a blanket. At the time we thought he was saying dump truck but we, we figured out that, I think it was the following day or something, that he was saying dump, he put her in a dump. I think he said when, when she got shot she fell down and she shook.

Id. at 433. When asked by the prosecutor if Cody's story ever changed, Heidi testified that after about a week after the murder, "he says Daddy shot [C.A]." Id. at 434. Heidi testified that when she took Cody to C.A.'s grave, Cody said, "[C.A.], I didn't shoot you, it wasn't me." Id. Heidi was asked by the prosecutor without objection: "But [Cody's] original story was graphic enough and his actions were graphic enough to indicate to you that he observed what he was saying?" Heidi answered, "Yes." Id. at 435.

The Kansas Supreme Court stated:

> According to Kurth, Cody's initial statement that "Tom did it" was an integral element of proof that Tom, rather than Floyd,

22

committed the crime. Kurth testified at the [Kansas district court §
1507] hearing that the decision not to object to Cody's later
statement that "Daddy did it" was a risk he weighed, and that he
concluded the risk was worth taking.

Considering, as we must, all of the circumstances at the time
and granting Kurth all the deference he is due, we nevertheless
conclude that his strategy regarding Cody's statements was
objectively unreasonable. Cody was only 2 years old when he
implicated first his uncle, then his father. In addition, even without
Cody's statements, there was considerable evidence pointing to Tom
as the perpetrator: His gun was the murder weapon; he had purchased
the bullets; he initially confessed to having killed C.A.; and he led
police to the body, which was buried behind the house where he
lived. Kurth could have relied on this evidence to support the
defense theory. Instead, he doggedly pursued a strategy that he knew
would reveal that Floyd's own son eventually pointed his small
finger at Floyd. We agree with [Jean] Phillips[, a legal expert called
by Floyd at the habeas hearing,] that this strategy was "a huge
mistake," particularly when it included no plan to mitigate Cody's
damaging "Daddy did it" statement. Such mitigation might have
taken the form of expert testimony on the likelihood that Cody's
original statement implicating Tom was more accurate than his later
statement implicating Floyd, perhaps because the latter was a product
of hearing others discuss his father's arrest. Had such testimony
been introduced, Kurth could have argued this implication in closing,
particularly after the State made its closing argument suggesting that
Cody was an eyewitness who originally said "Tom did it" because his
father told him to. But Kurth did none of these things. He put the
exculpatory statement in front of the jury, knowing that the
inculpatory statement would follow, and did nothing to explain the
difference or its significance. Under these circumstances, the mere
invocation of the word "strategy" does not insulate Kurth's
performance from constitutional criticism.

283 Kan. at 94-95.

To determine if Kurth's performance was deficient, "the relevant inquiry is

whether trial counsel's decision was an informed tactical decision that was

reasonable under the circumstances of the case." Brecheen v. Reynolds, 41 F.3d

23

1343, 1369 (10th Cir. 1994). Further, "the mere incantation of 'strategy' does not insulate attorney behavior from review." Id. (internal quotations and citation omitted). Kurth articulated a strategic reason for introducing Cody's hearsay statements—Cody said that Tom shot C.A., which directly supports the defense's theory of the case that Tom, not Floyd, was guilty. However, even though Kurth thought "the risk [that Cody's statements implicating Floyd would be admitted] was worth taking," 283 Kan. at 94, this strategy was unreasonable under the circumstances of the case. Kurth opened the door for additional statements made by Cody that Floyd committed the murder, and Kurth had no strategy to mitigate the negative impact of Cody's additional statements implicating his client.

The prosecutor, at the state district court § 1507 hearing, testified that he offered these statements not for their truth, but merely to establish that Cody was present when C.A. was shot, no matter who the shooter may have been. Indeed, the federal district court summarized the importance of Cody's statements to the prosecution: "If Cody saw the crime occur, as the prosecutor argued, Tom could not have committed the crime, since he was not with Cody on November 5 or 6, 1999." Mem. and Order at 36. Even if Cody's statements were not offered for their truth, they are still objectionable.

The Kansas Supreme Court was not objectively unreasonable for concluding that the admission of Cody's statements, while demonstrative of counsel's deficient performance, was not prejudicial to Floyd. As the Kansas

24

Supreme Court stated:

> Although Cody's statement was damaging, given the jury's knowledge of his age, and inconsistency, we are not prepared to say that it prejudiced Floyd's case. The State introduced other, far more damaging evidence, principally Tom's recitation of Floyd's admissions the day after C.A.'s disappearance. . . . Tom's credibility was critical; and the jury chose to believe him.

283 Kan. at 106. Because of the obvious reliability issues with Cody's statements and the other evidence against Floyd, the Kansas Supreme Court determined that the admission of Cody's statements was not prejudicial. We agree that, considering all of the evidence and noting that the jury had the opportunity to hear Tom's testimony and judge his credibility, there is not a reasonable probability that but for counsel's errors the result of the proceeding would have been different. The Kansas Supreme Court's determination that the admission of this evidence did not prejudice Floyd is not an unreasonable application of Strickland.

3.      Detective Frost's Credibility Vouching

During the direct examination of Detective Troy Ryan Frost, Floyd's counsel did not object when Frost was asked about whether he believed certain statements Floyd made to him. Frost said that Floyd told him he loved C.A., and that he had visited the trailer on the afternoon of her disappearance. These two facts are important, because they gave Floyd motive and opportunity. The objectionable trial testimony between the prosecutor and Frost about Frost's

25

conversation with Floyd is as follows:

> [Prosecutor]: When [Floyd] said that he had gone to the trailer that day did you believe him?
>
> [Frost]: I believed him.
>
> [Prosecutor]: What he was indicating to you through your questions and his statement how he felt about her was, you think he was being genuine?
>
> [Frost]: Oh yes.

ROA, Vol. III, at 511.

It is improper for a witness to vouch for the credibility of someone else's statement. Credibility determinations are within the province of the jury. United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993) (explaining that the credibility of witnesses is not an appropriate subject for expert testimony because it "usurps a critical function of the jury," "is not helpful to the jury, which can make its own determination of credibility," and may be "prejudicial and unduly influence[] the jury"). The Kansas Supreme Court and the federal district court both found that Floyd's counsel's failure to object to this testimony was unreasonable.

The Kansas Supreme Court concluded that Kurth was objectively unreasonable for failing to object to Frost's credibility vouching: "Kurth did not object to this questioning and testified at the [habeas] hearing that he could not recall any strategic reason for not doing so. Floyd is correct; this was

26

objectionable testimony that invaded the province of the jury." 283 Kan. at 98. However, the Kansas Supreme Court found that this testimony was not prejudicial because it involved such a small part of the evidence presented and, "even if Frost's objectionable statements had been omitted, the jury still would have heard Floyd's statements [as reported by Detective Frost] that [Floyd] went to the trailer the day C.A. disappeared and that [Floyd] loved her." Id. at 106.

The federal district court disagreed, stating that the Kansas Supreme "[C]ourt again ignored the emphasis placed by the prosecutor in closing argument upon [Floyd's] alleged 'love' for C.A. as a motive for the crime." Mem. and Order at 34.

However, the Kansas Supreme Court was not objectively unreasonable for concluding that Frost's credibility vouching was not prejudicial to Floyd. Frost's credibility vouching was a very small part of the evidence presented, and, thus, there is not a reasonable probability that, but for the credibility vouching, Floyd would not have been found guilty. We note that Floyd does not challenge Frost's credibility when he testified that Floyd got "real emotional" and then told him he went to the trailer that day, and that he loved C.A. ROA, Vol. III, at 510. Additionally, as the state argued, Frost's statements "did not concern Tom's credibility, which was the single most decisive factor for the jury to consider." Aplt. Br. at 33. The Kansas Supreme Court's determination that this deficiency was not prejudicial is not objectively unreasonable under the AEDPA's standards.

27

4.     Erroneous Statements in the Prosecutor's Closing Argument

There were also several instances during closing argument where the prosecutor misrepresented the evidence and Kurth made no objection. However, the court did instruct the jury prior to counsels' closing arguments that "an attorney's statements are not evidence and should be disregarded if the statements are not supported by the evidence." Mem. and Order at 35. The Kansas Supreme Court found Kurth's failure to object deficient:

> [The prosecutor's] statements were outside the wide latitude given a prosecutor in discussing the evidence and thus could have been subject to a sustainable objection. . . . Lacking any strategic explanation in the record for Kurth's failure to object, and given the repeated nature of the prosecutor's behavior, we agree that Kurth was ineffective by failing to object to these statements.

283 Kan. at 101-02 (internal citations omitted). The Kansas Supreme Court found that the prosecutor's misstatements were not prejudicial because the misstatements "were not enough to take the jury's eyes off the ball." Id. at 106. The district court again disagreed, finding that the failures to object, combined with the other deficiencies in Kurth's performance at trial, were prejudicial, and noting that each misstatement of fact "related directly to the 'Tom versus [Floyd]' issue." Mem. and Order at 34.

The Kansas Supreme Court found three of the prosecutor's statements during closing argument to be "troubling." 283 Kan. at 101. First, the prosecutor erroneously said that "[t]he physical evidence shows that Tom didn't do it."

ROA, Vol. IV, at 986. There was no physical evidence that excluded Tom as the killer. Further, there was physical evidence linking Tom to the crime. The gun was Tom's; the bullets were purchased by Tom.

Second, the prosecutor misquoted Cody's hearsay testimony in closing argument. The prosecutor stated:

> [Floyd] wasn't alone. We know there w[ere] at least three people there, him and [C.A.], and he brought his son. His son sat in the vehicle and he watched Floyd Scott Bledsoe put the gun to the back of his aunt's head and pulled the trigger.
> Floyd takes care of the body, gets back in the car, Cody says, "You killed [C.A.]." Imagine what went through that boy's mind. When Floyd Scott Bledsoe convinced his two-year-old son to say Tom did it, as soon as that powerful influence of his father was out of his presence he was comfortable with telling the truth, spontaneous comments by two-year-old children, going to the grave site, a spontaneous–two-year-old children don't use a lot of reasoning or deduction, but when he goes to [C.A's] grave he explains to her, because he was there, that he didn't do it. "[C.A.], I didn't kill you, my dad did."

Id. at 986. However, according to Heidi's testimony, Cody did not say, "[C.A.], I didn't kill you, my dad did," as reported by the prosecutor in his closing argument. Instead, Heidi testified that Cody said, "[C.A.], I didn't shoot you, it wasn't me." Id., Vol. II, at 434. While it is true that at some point after Floyd's arrest, according to Heidi, Cody began to implicate Floyd in the murder, there was no evidence that Cody implicated Floyd when he was taken to the grave site. The prosecutor misrepresented the evidence by misquoting Heidi's testimony.

Finally, the prosecutor erroneously said that a psychologist testified that

29

Cody was present during the murder. Near the end of his initial closing, the prosecutor said:

> Ladies and gentlemen, Mom, Floyd, and Cody explained to you it was Floyd. Tom couldn't have done it. [Floyd's] wife, his wife explains to you, and she, her testimony clearly wasn't skewed. It didn't present all kinds of bolstering testimony for the State to show that her husband had killed her sister. What it did do was it reinforced the fact that Cody was there. Her perception, she'd raised him since he was young, Cody was there. A psychologist, based on the information she said, Cody was there. There's only one way Cody would have been there, ladies and gentlemen. He didn't walk, he didn't crawl, he didn't ride a horse; he was with his father when [C.A.] was killed. He was never with Tom that whole evening. He was with Floyd.

Id., Vol. IV, at 989. No psychologist testified that Cody was there. The only psychologist to testify at the trial (Claudine Boldridge) said that some students had come in complaining that Tom had "messed with other kids on a fishing trip," and one had heard Cody talking at church about C.A.'s murder. Id., Vol. II, at 416, 418. However, Boldridge did not testify as an expert and did not give her opinion about whether Cody actually witnessed the murder.

Kurth's failure to object during closing argument does not establish prejudice. A jury instruction may minimize the impact of any error made by misstating the evidence in closing arguments. See, e.g., Thornburg v. Mullin, 422 F.3d 1113, 1134 (10th Cir. 2005) (explaining that a judge's instructions that the jury "should consider only the evidence introduced at trial, that the attorneys' statements and arguments are not evidence, and that the jury bore the

30

responsibility of determining the credibility of each witness" "may minimize the impact of a prosecutor's misstatements"). We agree with the Kansas Supreme Court that the prosecutor's misstatements, particularly in light of the court's instruction that attorneys' statements are not evidence, "were not enough to take the jury's eyes off the ball." 283 Kan. at 106. The Kansas Supreme Court's determination that this deficiency was not prejudicial is not objectively unreasonable under AEDPA standards.

   5.   Catherine Bledsoe's Vouching for Tom

Floyd and Tom's mother, Catherine Bledsoe (Catherine), testified that she told Floyd she knew Tom did not murder C.A., and Floyd agreed with her that Tom did not do it. ROA, Vol. IV, at 776. Specifically, Catherine said, "[Floyd] called me and he said that he didn't do it and I says, 'Well, I know Tom didn't do it.'" Id. Catherine's testimony was not found to be objectively unreasonable by the Kansas Supreme Court. The Kansas Supreme Court stated:

> At trial, Catherine Bledsoe related a conversation she had with Floyd shortly after he was arrested and Tom was released, in which she and Floyd agreed that Tom did not kill C.A. Floyd argues that this was inadmissible, damaging, prejudicial testimony concerning Floyd's mother's opinion of Tom's culpability. We agree with the [Kansas] district court's determination that Floyd fails to meet his burden to show that Kurth's representation was constitutionally deficient on this point.

283 Kan. at 100.

The federal district court found the failure to object to Catherine's

31

testimony objectively unreasonable. The district court characterized Catherine's testimony as "the credibility call of a mother in a swearing match between two brothers." Mem. and Order at 47. The district court found that not objecting to this testimony was both deficient and prejudicial.

The Kansas Supreme Court reasonably concluded that Kurth's failure to object to Catherine's testimony was not deficient. Catherine's testimony could easily indicate that she thought neither of her sons capable of murder. Even assuming Kurth's failure to object to Catherine's testimony was deficient, such a deficiency would not be prejudicial.

Finally, the Kansas Supreme Court was not objectively unreasonable under the AEDPA's standards when it determined that the cumulative effect of counsel's deficiencies was not prejudicial to Floyd.

### III

The Kansas Supreme Court was not objectively unreasonable in its decision to deny Floyd habeas relief. The district court's grant of habeas relief is reversed.